**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **FRANK HOHN,** | ) | **Case No. 8:05CV552** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **BRIEF IN SUPPORT OF** |
| **vs.** | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| **BNSF RAILWAY COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### INTRODUCTION

The Plaintiff Frank Hohn ("Hohn") has brought a disability discrimination action against the Defendant, the BNSF Railway Company, ("BNSF"). Hohn alleges that the BNSF retaliated against him after he made a hotline safety complaint and has violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.,* ("ADA") and the Nebraska Fair Employment Practices Act ("NFEPA") Neb. Rev. Stat. §§ 48-1101 *et. seq.,* in failing to provide a reasonable accommodation for Hohn to continue to work as a locomotive machinist with his visual impairment. Hohn's complaint's of retaliation and violation of NFEPA are barred by the statute of limitations; Hohn's claims of disparate treatment or failure to accommodate under the ADA are barred because they were not administratively exhausted; Hohn is not a qualified individual with a disability within the meaning of the ADA; and there is not a reasonable accommodation available that would allow Hohn to work safely in his position as a locomotive machinist given the nature of the machinist position and the environment that Hohn would have to work in at the Alliance Facility.

## STATEMENT OF MATERIAL FACTS

1.      The BNSF is a railway company with mechanical facilities in Alliance, Nebraska.  (Filing No. 29, ¶ 7).

2.      Hohn was hired by the BNSF on December 8, 1997 to work as a locomotive machinist in the BNSF's Alliance Facility.  (Filing No. 29, ¶ 11).

3.      Some of the essential functions of the machinist position include:

   a.  Performing locomotive servicing, maintenance, troubleshooting, and other machinists' duties as directed by a supervisor or per union agreement;

   b.  Inspecting locomotive components (including internal engine inspection of pistons, cylinders, liners and crank case) periodically as required by federal regulation and at other intervals per company policy;

   c.  Inspecting fuel and all other fluid levels in locomotive, as necessary;

   d.  Inspecting wheels to ensure that flange, rims, treads, plate, hub, axle and bearing are in good repair;

   e.  Inspecting brake apparatus including brake shoes, beams, hangers, rods, and associated equipment, inspects locomotives for any visible or audible leaks in water, fuel, or oil lines;

   f.  Using test equipment to install, calibrate, and verify the

2

operational specifications of equipment or systems;

g.  Operating proper electric, pneumatic, or hydraulic hand tools

such as drills, impact wrenches, power saws and grinders;

h.  Accurately distinguishing and interpreting signals, signs,

machine/equipment displays, and accurately distinguishing

colors as well as possessing spatial perception to work safely

within, around, over and under locomotives;

i.  Safe and frequent using of machinery/equipment (such as

power tools, hand tools, forklifts, overhead and wheel based

cranes, etc.); and

j.  Frequent bending, stooping, kneeling, and climbing ladders, and

frequent walking on uneven/angled surfaces;

(Declaration of Hobbs, ¶ 8; Declaration of Miller, ¶ 5; Deposition of

Hohn, Ex. 4A, 37:22-63:1, 63:14-66:18, 81:1-83:16, 134:18-137:3,

Ex. 4B, 52:12-56:25).

4.    In December 2002, Hohn fractured his right wrist while playing with

his dog outside and was off work until he was released to return to

work without restrictions. (Deposition of Hohn, Ex. 4A, 91:21-

94:25).

5.    In the fall of 2003, Hohn requested that there be a lighting

adjustment made in the diesel pit because the light shined in

Hohn's eyes when he was changing the brake shoes.  This request

was not related to any vision problem Hohn was experiencing, but

because Hohn was annoyed.  (Deposition of Hohn, Ex. 4A, 108:1-114:10).

6.   On December 11, 2003, Hohn fell while working the second shift for the BNSF and fractured the bone above his right wrist.  (Deposition of Hohn, Ex. 4A, 115:20-124:1; 127:3-8; 130:10-22).  As a result Hohn was put on a type of light duty during the time he recovered from the fracture.  (Deposition of Hohn, Ex. 4A, 132:16-142:14).

7.   Calvin Hobbs, the Shop Superintendent for the Alliance Facility had a concern that the reason Hohn fell in December 2003 was related to an unknown visual problem of Hohn's.  Hobbs decided that Hohn would be watched when he returned to full duty to determine if Hohn had any problems with his vision that impaired Hohn's ability to work safely as a machinist.  (Declaration of Hobbs, ¶ 4).

8.   Hohn was released to work without restriction in late March or early April 2004 and was assigned to work in C Building of the BNSF Alliance Facility.  (Deposition of Hohn, Ex. 4A, 142:17-20).  The heavier locomotive repairs are done in C Building such as changing out the turbocharger, radiator replacement, and air compressor replacement. (Deposition of Hohn, Ex. 4A, 37:22-40:6).  C Building is like a big garage where locomotives are parked and there are moveable platforms that can be rolled alongside and attached to a locomotive to work on the engine.  (Deposition of Hohn, Ex. 4A, 45:25-46:16).  There could be as many as 15 locomotives in C

Building at one time.  The floors are rough in C Building, but it is not like walking on ballasts.  (Deposition of Hohn, Ex. 4A, 60:21-61:8). Photographs of C Building are found in Hohn's Deposition, Ex. 4B:

a. Exhibit 4B9 is the roll up doors; (Deposition of Hohn, Ex. 4B, 24:5-24:9);

b. Ex. 60 is of the lights that warn of moving locomotives; (Deposition of Hohn, Ex. 5, 24:10-24:25);

c. Ex. 61 looking toward D Building or the material department; (Deposition of Hohn, Ex. 4B, 26:5-26:18);

d. Ex. 62 is a locomotive and the tracks are depicted in C Building; (Deposition of Hohn, Ex. 4B, 26:19-27:2);

e. Ex. 63 is a locomotive moving into C Building; (Deposition of Hohn, Ex. 4B, 27:3-27:11);

f. Ex. 65 is the rolling platform/stairway that is used in C Building; (Deposition of Hohn, Ex. 4B, 27:17-27:24);

g. Ex. 67 depicts a machinist changing out a turbocharger; (Deposition of Hohn, Ex. 4B, 27:25-28:19);

h. Ex. 68 is the exhaust sections; (Deposition of Hohn, Ex. 4B, 29:10-16);

i. Ex. 69 depicts hoses on the ground in C Building; (Deposition of Hohn, Ex. 4B, 30:14-19);

j. Ex. 70 is 10 track pit in C Building with six steps going down; (Deposition of Hohn, Ex. 4B, 30:5-10);

k. Ex. 71 is the southeast corner of C Building looking west; (Deposition of Hohn, Ex. 4B, 31:24-32:3);

l. Ex. 72 depicts a shelled out gear train in C Building; (Deposition of Hohn, Ex. 4B, 32:8-16);

m. Ex. 73 is a ladder on a locomotive that would have to be used if a machinist would need to change out a radiator section; (Deposition of Hohn, Ex. 4B, 32:19-25);

n. Ex. 76 a typical set up in C Building; (Deposition of Hohn, Ex. 4B, 34:13-19); and

o. Ex. 77 depicts the tracks in C Building; (Deposition of Hohn, Ex. 4B, 35:2-4).

9. In April 2004, Doug Miller, a General Foreman at the BNSF Alliance facility wrote a memo noting that he personally observed that Hohn was having difficulty with his vision and that other employees had expressed concern about Hohn's ability to work safely because of his vision problem. There was a concern that Hohn would walk out in front of a moving train. (Declaration of Douglas Miller, ¶ 4, Exhibit 2A).

10. Jennifer Crawford and Cecilia Deichert, supervisors of mechanical and locomotives, respectively, at the BNSF Alliance facility also notified Calvin Hobbs of their concerns about Hohn's ability to work safely given Hohn's vision problem on April 25, 2004, and April 20, 2004. (Declaration of Calvin Hobbs, ¶ 5, and Exs. 1A and 1B).

11.    Calvin Hobbs decided to pull Hohn from duty in order to allow Hohn to get his vision checked so that a decision could be made as to whether Hohn could work safely.  Hohn would be allowed to come back to work if his eye doctor indicated that he did not have any restrictions.  (Declaration of Hobbs, ¶ 6).  On April 26, 2004, Calvin Hobbs authored a letter to Hohn informing him that he was being placed on paid medical leave for five days to allow Hohn to get his vision checked out by an eye doctor.  (Declaration of Hobbs, Ex. 1D).

12.    On April 19, 2004, Hohn called in a hotline complaint using the BNSF's internal hotline complaint system regarding instructions he was given by General Foreman Scott Miller to fully load an engine when Hohn believed it was unsafe to do so because of a missing cylinder and also based on an incident that happened a year prior with General Foreman Scott Miller and another employee. (Deposition of Hohn, Ex. 4A, 156:5-157:4).

13.    On April 29, 2004, when Hohn returned to work from vacation, he was called into the General foreman's office and advised that he was being placed on paid medical leave for a period of five days so that he could get his vision checked out by an eye doctor and was directed to call Angela Bailey, the BNSF Regional Manager for Medical and Environmental Health.  (Deposition of Hohn,  Ex. 4A,

165:14-166:1, Deposition of Hohn, Ex. 4B, 39:19-20, Declaration of Hobbs, ¶ 6, Ex. 1B).

14.     Hohn chose to see Dr. Robert Dietrich for his eye exam on May 10, 2004.  (Deposition of Hohn, Ex. 4A, 182:1-185:14).  Dr. Dietrich is an optometrist licensed in the state of Nebraska and has been practicing for 31 years.  (Deposition of Dietrich, 4:14-20).

15.     Dr. Dietrich found that Hohn had an advanced stage of Retinitis Pigmentosa when he saw him on May 10, 2004.  (Deposition of Dietrich, 14:6-16).  Retinitis Pigmentosa is a degenerative eye disease resulting in tunnel vision and night blindness or nyctalopia with a high propensity to go blind.

> Because the peripheral retina, which is composed of the photoreceptors called the rods, those photoreceptors are responsible for night vision and only the cones, which are located in the central retina, in the area called the macula, are responsible for daytime vision and/or color vision.  So when the rods are having trouble in Retinitis Pigmentosa, you're losing, yes, night vision, and, of course, your peripheral vision because your rods are pretty much defunct,--or not functional.

(Deposition on Dietrich, 15:22-16:7, 18:1-2).  There is no known cure for Retinitis Pigmentosa.  (Deposition of Dietrich, 23:11-18).

16.     A normal person has 140 degrees of visual field in each eye, Hohn had 15 degrees of visual field in one eye and 18 degrees in the other on May 13, 2004.  (Deposition of Dietrich, 17:17-24).  "And best way to, in layman's terminology, is if you just took a regular drinking straw and held it up one to each eye.  And that is the field

of view that he is confronted with on a daily basis." (Deposition of Dietrich, 16:10-13). This was Hohn's vision in May 2004 and Hohn would not have been able to see obstacles in his path, things on either side of him, or objects above him, unless he was looking directly at the object. (Deposition of Dietrich, 16:13-25). Hohn would have to:

> [b]e a head mover to move his eyes to the field he wants to look at. And you can see that when you watch him in his movements. I've observed him, of course, closely. I've examined him many times. He's adapted pretty well, but in certain circumstances, as with working with other individuals in team efforts or with moving objects, it would be very difficult, I would think, to avoid accidents.

(Deposition of Dietrich, 17:1-6).

17. As of May 13, 2004, Hohn's vision did not meet the minimum requirement for a driver's license in the state of Nebraska. (Deposition of Dietrich, 22:10-23). Nebraska requires a minimum of 100 degrees visual field in at least one eye to obtain and maintain a driver's license. (Deposition of Dietrich, 25: 10-21, Ex. 5, 247 NAC 7-002.01B). Hohn had a visual field on May 13, 2004, of 15 degrees in one eye and 18 degrees in the other eye. (Deposition of Dietrich, 25:17-21).

18. During the May 13, 2004, eye appointment, Dr. Dietrich also discussed with Hohn that he may not be able to continue actively working and it may be necessary to place Hohn on permanent disability. (Deposition of Dietrich, 23:3-9).

19.   Hohn was informed in May 2004 by Dr. Dietrich that he had a loss in his visual field and that he may have Retinitis Pigmentosa, and would gradually lose his visual field.   (Deposition of Hohn, Vol 1, Ex. 4A, 191:23-22, Deposition of Dietrich, 23:3-9).

20.   At the May 13, 2004, appointment with Dr. Dietrich, Hohn did not request that Dr. Dietrich inform the BNSF that Hohn was released to return to work without restrictions despite the fact that Hohn had been on paid medical leave to see an eye doctor for fourteen days by that time.  (Deposition of Dietrich, 26:20-24).

21.   Hohn sought to improve his vision by consulting with a naturopath in Wyoming, Dan Young, after finding out his diagnosis from Dr. Dietrich.   (Deposition of Hohn, Ex. 4A, 188:5-20, Deposition of Dietrich, 23:12-18).

22.   On June 4, 2004, Calvin Hobbs agreed to extend the time Hohn was on paid medical leave until June 9, 2004, to allow Hohn additional time to get his medical evaluation.   (Declaration of Hobbs, ¶ 6, Ex. 1F).

23.   Despite the directions to contact Angela Bailey with the BNSF Medical and Environmental Health in the April 29, 2004, letter from Hobbs placing Hohn on paid medical leave (Ex. 1D), Hohn waited until June 2004 to initiate contact with Angela Bailey (BNSF). (Deposition of Hohn, Ex. 4B, 57:6-17).

24.     On June 17, 2004, Dr. Dietrich at the request of the BNSF, filled out a Medical Status Form for Non Work Related Medical Conditions. In this form Dr. Dietrich imposed the following restrictions on Hohn's ability to work: no walking on uneven surfaces; occasional stooping, bending and twisting; no operating vehicles or machinery; no climbing ladder or scaffold; no working on unprotected heights; occasional lifting over 20 pounds; and no task that requires a visual field exceeding 15 degrees.  Dr. Dietrich recommended that Hohn work a desk job.  (Deposition of Dr. Dietrich, 27:3-28:25, 30:11-13, Ex.  3A).   Dr.  Dietrich's  opinions  on  the  restrictions  he recommended for Hohn have not changed since June 17, 2004, other than Dr. Dietrich now believes that permanent disability may be advisable.  (Deposition of Dr. Dietrich, 31:9-15).  The fact that Hohn violates these restrictions in his daily life does not change Dr. Dietrich's mind as to the necessity of these restrictions.  (Deposition of Dietrich, 32:12-17; 45:5-7).

25.     Dr. Dietrich restricted Hohn from walking on uneven surfaces and to  occasional  stooping,  bending,  kneeling  and  twisting  due  to Hohn's restricted peripheral vision.  He is not very good at depth perception and Hohn could fall and hurt himself.  (Deposition of Dietrich, 29:1-9).  An uneven surface includes steps, ramps, tracks, and uneven cement.  (Deposition of Dietrich, 29:18-25).

26.   Dr. Dietrich restricted Hohn from operating vehicles or machinery because Hohn may run into objects or people causing accidents. Machinery includes forklifts, drills, and power tools.  (Deposition of Dietrich, 29:11-17).

27.   Dr. Dietrich restricted Hohn from climbing ladders and scaffolds and working on unprotected heights because Hohn's depth perception is challenged and he might miss a step and fall on ladders going up or down, and may not be able to judge the end of a scaffold and fall off.  (Dr. Dietrich's deposition 30:2-10).

28.   Hohn disagrees with the restrictions imposed by Dr. Dietrich and has chosen to violate each and every restriction in his every day life.  (Plaintiff's Responses to Request for Admission No. 27, and Defendant's Request for Admissions No. 27, Ex. 6).  Hohn has continued to drive a vehicle and drove from his home in Hemmingford, Nebraska, to the first half of his deposition in Denver, Colorado, on October 31, 2006, and from Hemminford to Alliance, Nebraska, for the second part of his deposition on December 20, 2006.  (Deposition of Hohn, Ex. 4A, 5:16-9:16-18; Deposition of Hohn, Ex. 4B, 49:20-50:1).

29.   On June 21, 2004, Hohn sent a letter to "Whom it May Concern" requesting protection under the Americans with Disabilities Act. (Deposition of Hohn, Ex. 4A, 45:6-46:22, Ex. 12).

30.     On July 22, 2004, Sharon Clark, D.O., MHP, a BNSF Field Medical
        Officer in the Medical and Environmental Health Division reviewed
        and adopted the restrictions recommended by Dr. Dietrich.
        (Declaration of Clark, ¶¶ 3 and 4, Ex. 3A and 3B).  Dr. Clark sent
        the Fitness for Duty Recommendation to Calvin Hobbs, the BNSF
        Shop Superintendent at the BNSF Alliance Mechanical facility, to
        determine if the restrictions imposed could be accommodated in
        Hohn's position as a machinist.   (Declaration of Clark, ¶ 4,
        Declaration of Hobb, ¶ 9).

31.     Calvin Hobbs concluded that Hohn's restrictions could not be
        accommodated in the locomotive machinist position because the
        essential functions of the machinist position would violate each of
        the restrictions imposed by Dr. Dietrich.  (Declaration of Hobbs, ¶
        9).

32.     Dr. Dietrich reviewed photographs of the working environment at
        the BNSF Alliance Facility during his deposition and has agreed
        that Hohn should not be allowed to work in the environment
        depicted in the photographs given his vision impairment.
        (Deposition of Dietrich, 37:1-16, Ex. 27, Ex. 65-75, and 78-88,
        Deposition of Hohn, Ex. 4B, 7:17-25; 27:17-34:12; 35:5-39:18).

33.     On August 17, 2004, Dr. Dietrich examined Hohn again.  Although
        the tests showed minimal improvement Hohn still was not able to

legally drive and Dr. Dietrich would not change the restrictions he had recommended for Hohn.  (Deposition of Dietrich, 33:11-35:2).

34.   On August 24, 2004, Dr. Dietrich reported to the BNSF that Hohn now had 15 degrees of peripheral vision in both eyes.  (Deposition of Dietrich, 31:18-20, Ex. 92).

35.   Hohn filed a Charge against the BNSF with the Nebraska Equal Opportunity Commission alleging that he was placed on medical leave on April 24, 2004, in retaliation for a hotline complaint he made on April 19, 2004 in violation of Neb. Rev. Stat. § 48-1114(3) August 24, 2004.  (Deposition of Hohn, Ex. 4B, 48:1-20, Ex. 94).

36.   On September 21, 2004, Hohn applied for services from the Commission for Blind and Visually Impaired.  (Deposition of Hohn, Ex. 4B, 58:2-59:19, Ex. 6).  His purpose in seeking help from the Commission was to get his job back at the BNSF.  (Deposition of Hohn, Ex. 4B, 58:20-11).  Hohn has not sought any other type of employment or retraining as anything but a machinist.  (Deposition of Hohn, Ex. 4B, 58:14-63:5, 78:2-11-79:24).

37.   Hohn has seen two ophthalmologist who have not disagreed with the restrictions imposed by Dr. Dietrich.  (Deposition of Hohn, Ex. 4A, 198:22-199:4).  Dr. Lawlor also imposed the same restrictions on Hohn in a Fitness for Duty Form he filled out and submitted to the BNSF on April 4, 2005.  (Ex. 3A, Declaration of Clark, ¶ 6).

38.    On May 5, 2005, Hohn sent a letter to Dr. Clark suggesting that he be allowed to perform a field test at the BNSF Alliance facility while under observation or be allowed to work without restrictions. (Deposition of Hohn, Ex. 4B, 91:23-92:15, Ex. 10).  Hohn also suggested that he be allowed to work in D Building because there would not be a need to climb a ladder or to walk on uneven surfaces.  (Deposition of Hohn, Ex. 4B, 92:17-25).

39.    Dr. Clark did not agree to allow Hohn to perform a field test because it would violate the restrictions recommended by Dr. Dietrich and adopted by the BNSF or to allow Hohn to work without the restrictions imposed.  (Declaration of Clark, ¶ 5).

40.    Calvin Hobbs believes that it would violate the restrictions imposed on Hohn to allow Hohn to work in D Building because there is a need for more than 15 degrees peripheral vision to work in D Building, there are uneven surfaces, and the potential for objects to be in an employee's path.  (Declaration of Hobbs, ¶ 11).

41.    It is Dr. Dietrich's opinion that Hohn should not be allowed to work in D Building because there are ramps, grated stepways, diamond metal casing stepways, and pits.  "It looks like a highly dangerous area.  And here's even a picture of some fluids . . . that could be slippery.  Yeah, fluids again, hoses, steps.  No definitely, this would be, in my opinion, an area of great danger for him to be in and work

safely with himself or among others."   (Deposition of Dietrich, 37:14-23, Exs. 78-88, Deposition of Hohn, Ex. 4B, 35:5-39:18).

42.   The NEOC made a finding of no reasonable cause on August 1, 2005.   Hohn received a copy of the decision of the NEOC on August 4, 2005.  (Plaintiff's Responses to Requests for Admissions, No. 26).

43.   Hohn filed his original Complaint in the above-captioned action on December 20, 2005.  (Filing No. 1).

44.   Hohn is legally blind.  (First Amended Complaint, ¶ 9).

45.   Dr. Dietrich currently questions whether Hohn is able to perform a desk job given his current condition that would involve placing order of any magnitude and importance.   (Deposition of Dietrich, 31:7-15).

46.   There is a position for machinists working with the Transportation Support System (TSS).  The duties of this position are to enter data on a computer related to the arrival and departure of locomotives; known defects of locomotive; document the work that is done on a locomotive as it progresses through the system; and it may also include ordering parts.   In addition to these duties of the TSS position, the machinist must be able to perform any essential function that may be assigned to a machinist.  (Declaration of Hodgson, ¶ 4).

47.     It is not possible for the BNSF to build or create a position to accommodate a disability due to the Collective Bargaining Agreement with the machinists. (Declaration of Hodgson, ¶ 6).

**ARGUMENT**

**I**

**THERE IS NO GENUINE ISSUE OF MATERIAL FACT AND THE BNSF IS ENTITLED TO SUMMARY JUDGMENT.**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c) and *Celotex Corp. V. Catrett,* 477 U.S. 317 (1986).  The party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e) and *Crossley v. Georgia Pacific Corp.,* 355 F.3d 1112, 1113 (8th Cir.  2004).

The Eighth Circuit Court of Appeals has disfavored summary judgment in employment discrimination cases because such cases are "inherently fact-based."  *Mayer v. Nextel West Corp.,* 318 F.3d 803, 806 (8th Cir. 2003).  Nevertheless, "summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case."  *EEOC v. Woodbridge Corp.,* 263 F.3d 812, 814 (8th Cir. 2001). The defendant is entitled to summary judgment if the plaintiff is unable to produce admissible, strong, direct evidence of discrimination, or admissible evidence which creates the requisite inference of

unlawful discrimination together with evidence of pretext.  "At the summary judgment stage the issue is whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating factor in the defendant's adverse employment action."  *Griffith v. City of Des Moines,* 387 F.3d, 733, 735 (8th Cir. 2004).

There is no genuine issue of material fact as to the following issues raised by the First Amended Complaint and the Answer.  (Filing Nos. 29 and 31):

1.    Hohn's claim of intentional violation of the Nebraska Fair Employment Practices Act and claim for retaliation are barred by the statute of limitations set forth in Neb. Rev. Stat. § 48-1120.01 (2004).

2.    That Hohn has failed to exhaust his administrative remedies as to his claims of intentional or disparate treatment and failure to accommodate.

3.    That Hohn is not qualified to perform the essential functions of the position of machinist with or without reasonable accommodations.

4.    That no reasonable accommodation exists which would permit Hohn to perform the essential functions of the machinist position.

In this case, summary judgment is proper because there is no dispute as to any material fact and the BNSF is entitled to judgment as a matter of law.

## II.

### HOHN'S CLAIM OF A VIOLATION OF THE NEBRASKA FAIR EMPLOYMENT PRACTICES ACT AND RETALIATION ARE BARRED BY NEB. REV. STAT. § 48-1120.01 (2004).

Hohn has alleged in his First Amended Complaint that the BNSF intentionally violated the Nebraska Fair Employment Practices Act ("NFEPA"), Neb. Rev. Stat. §§ 48-110 through 48-1125 (2004), in not providing an accommodation for his disability and  retaliated against him for making a Hotline Safety Complaint on April 19, 2004, by placing him on paid medical leave on April 29, 2004.  (Filing No. 20, ¶¶ 40-51).  Although Hohn refers to a federal whistleblowing law in his First Amended Complaint, Hohn has subsequently admitted in his Answers to Interrogatories that he is not aware of any federal whistleblower law which is applicable to his claim and that his whistleblower claim is being brought pursuant to Neb. Rev. Stat. § 48-1114(3).  (Plaintiff's Answers to Interrogatories, No. 6).

Any claim that Hohn has for a violation of NFEPA, whether it be disability discrimination or retaliation for opposing an unlawful action, is barred by the statute of limitations contained within NFEPA.  Neb. Rev. Stat. § 48-1120.01. The statute of limitations for filing an action in district court is ninety days after the complainant receives notice of the last action of the Nebraska Equal Opportunity Commission ("Commission").   Hohn received notice of the Commission's determination that there was no reasonable cause for his charge of disability discrimination and for retaliation on August 4, 2005.  (Plaintiff's Responses to Requests for Admissions, No. 26, Defendant's Request for Admissions Ex. 4B).

19

The deadline for Hohn to file an action in district court for a violation of NFEPA was November 2, 2005.  Hohn did not file a Complaint in district court until December 20, 2005.  Therefore any claim for a violation of NFEPA that Hohn may have is barred by the statute of limitations contained within Neb. Rev. Stat. § 48-1120.01 (2004).

### III.

### HOHN HAS FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES.

A plaintiff is required by the ADA to exhaust administrative remedies before filing a claim in court.  42 U.S.C. § 12117; 42 U.S.C. § 2000e-5, and *McSherry v. Trans World Airlines, Inc.,* 81 F.3d 739, 470 n.3 (8th Cir. 1996).  Such a charge must be filed within 300 days of when the event occurred. *Conner v. Recklitt & Coleman, Inc.,* 84 F.3d 1100, 1102 (8th Cir. 1996).

> In determining whether an alleged discriminatory act falls within the scope of a [discrimination] claim, the administrative complaint must be construed liberally 'in order not to frustrate the remedial purposes of [the ADA and the ADEA]' and the plaintiff may seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge." *Nichols (v. American National Insurance Co.),* 154 F.3d at 886-87 (8th Cir. 1998) (citations and internal citation omitted). "Accordingly, the sweep of any subsequent judicial complaint may be as broad as the scope of the EEOC 'investigation which could reasonably be expected to grow out of the charge of discrimination.'" *Cobb v. Stringer,* 850 F.2d 356, 359 (8th Cir.1988) (citation omitted). Allegations outside the scope of the EEOC charge, however, circumscribe the EEOC's investigatory and conciliatory role, and for that reason are not allowed. *Williams v. Little Rock Mun. Water Works,* 21 F.3d 218, 223 (8th Cir.1994) (citation omitted).

*Kells v. Sinclair Buick-GMC Truck, Inc.,* 210 F.3d 827, 836 (8th Cir. 2000).

Hohn's Charge filed with the NEOC on August 24, 2004, alleges that the date of the discrimination was April 29, 2004, the date he was placed on medical leave, as being the earliest and latest date the discrimination took place.  The body of Hohn's Charge is as follows:

I.      I have a disability.  I have worked for the Respondent as a machinist.  On 4/19/2004, I reported to the Corporate Safety Hotline that I had been ordered by the Respondent to violate safety regulations.  As a result of what I reported, on 4/29/2004, Calvin L. Hobbs Shop Superintendent advised me in writing that I was being withheld from service in order to have my eyes examined.  As of this date I have not worked because the Respondent has placed [me] on medical leave.

II.     I believe that I have been discriminated against on the basis of retaliation and disability in violation of Section 48-114 and 48-1114(3) of the Nebraska Fair Employment Practice Act as Amended and the Americans with Disabilities Act of 1990 as Amended for the following reasons:

    A.      I reported that the respondent ordered me to load test a locomotive with a defective engine that I believe is a safety violation.

    B.      As a result of what I reported I was required to take an eye examination.

    C.      Ed McDuffie, Mike Mees, Don Benzel, and David Peters have eye conditions and they have not been pulled from service and placed on medical leave.  I believe I was pulled from service in retaliation for what I reported.

    **D.      <u>My disability does not prevent me from performing the essential functions of my position.</u>**

(Plaintiff's Responses to Defendant's Request for Admissions, No. 25, Defendant's Request for Admission, Ex. No. 4).  When Hohn filed the Charge with the NEOC, August 24, 2004, Hohn knew of the restrictions recommended by Dr. Dietrich and adopted by the BNSF.   (Plaintiff's Answer to Request for Admission No. 27, Attached Ex. 6 to the Defendant's Request for Admissions).  Yet there is no mention of any failure to accommodate in his Charge.  Note that the emphasis of Hohn's complaint is not that he was treated differently because

of his disability, but that he was treated differently because of the Hotline complaint that he made.  In Hohn's Charge, he does not even indicate that he needs an accommodation or that the BNSF failed to engage in the interactive process.

The First Amended Complaint can be summarized as raising the following claims:

1.      Hohn was placed on medical leave in retaliation for filing a safety hotline complaint.  (Filing No. 29, ¶¶ 17-23).

2.      The BNSF violated the ADA by placing Hohn on medical leave on April 29, 2004, and extending that leave.  (Filing No. 29, ¶ 42).

3.      The BNSF failed to engage in the interactive process to determine if a reasonable accommodation existed that would allow Hohn to continue to work as a machinist.  (Filing No. 29, ¶ 37).

4.      The BNSF failed to provide a reasonable accommodation for Hohn's disability as follows:

   a. In the fall of 2003 in failing to provide a lighting accommodation. (Filing No. 29, ¶¶ 15 and 16); and

   b. In failing to accommodate Hohn's restrictions imposed by his physician.  (Filing No. 29, ¶ 39);

It is the BNSF's position that the claim of failure to accommodate and disparate treatment are not like or reasonably related to Hohn's allegation that he was placed on medical leave in retaliation for making a safety hotline complaint.  In fact, Hohn continues to dispute the necessity of placing him on medical leave on

April 29, 2004, and does not agree that the restrictions recommended by his eye doctor are necessary despite knowing that three medical professions who have examined him have agreed to the restrictions initially imposed in July 2004. (Filing No. 29, ¶¶ 27, 28, and 29, Deposition of Hohn, Ex. 4A, 198:17-199:4). Hohn wants his cake and wants to eat it to.  On one hand he wants the protection of the ADA, on the other hand he wants to argue that he is not disabled and should be allowed to work without restrictions.  While the BNSF acknowledges that Hohn has a disability, Hohn does not.

Failure to provide a reasonable accommodation is a separate and distinct claim than disparate treatment based upon a disability and each claim has its own burden of proof.

> The burden of proof depends on the type of claim that is alleged.  If a party alleges a claim of discriminatory disparate treatment, then the traditional burden-shifting framework of *McDonnell Douglas* will apply. *See, e.g., Stanback v. Best Diversified Products, Inc.,* 180 F.3d 903, 908 n. 6 (8th Cir.1999); *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir.1999) (en banc). The plaintiff must initially establish each element of the prima facie case. *Kiel,* 169 F.3d at 1134. The employer "must then rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action." *Id.* at 1135. If the employer does this, then "the burden of production shifts back to the plaintiff to demonstrate that the employer's non-discriminatory reason is pretextual." *Id.*
>
> [5] However, if a party makes a reasonable accommodation claim, then we apply a modified burden-shifting analysis. *E.g., Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1112 (8th Cir.1995); *see also Dropinski v. Douglas County,* 298 F.3d 704, 707-08 (8th Cir.2002); *Fjellestad v. Pizza Hut of America, Inc.,* 188 F.3d 944, 948-53 (8th Cir.1999); *Montgomery v. John Deere & Co.,* 169 F.3d 556, 562-63 (8th Cir.1999) (Lay, J., concurring) (noting that *McDonnell Douglas* should not apply in an ADA reasonable accommodation claim); *Mole v. Buckhorn Rubber Prods., Inc.,* 165 F.3d 1212, 1219-20 (8th Cir.1999) (Lay, J., dissenting) (same); *cf. Mason v. Frank,* 32 F.3d 315, 318-19 (8th Cir.1994) (applying the same analysis under the Rehabilitation Act of 1973). Under *Benson,* a plaintiff

"at all times retains the burden of persuading the trier of fact that he has been the victim of illegal discrimination due to his disability." 62 F.3d at 1112 (citations omitted). Thus, he must first make a facial showing that he has an ADA disability and that he has suffered adverse employment action. Then he must make a facial showing that he is a "qualified individual.". . .

[7] Further, if the employee cannot perform the essential functions of the job *without* an accommodation, he must only make a "facial showing that a reasonable accommodation is *possible* ...." *Id.* at 1112 (emphasis added). "The burden of production [then] shifts to the employer to show that it is unable to accommodate the employee." *Id.; Fjellestad,* 188 F.3d at 949. "If the employer can show that the employee cannot perform the essential functions of the job even with reasonable accommodation, [then] the employee must rebut that showing with evidence of his individual capabilities." *Benson,* 62 F.3d at 1113 (citations omitted). "At that point, the employee's burden merges with his ultimate burden of persuading the trier of fact that he has suffered unlawful discrimination." *Id.* (citations omitted).

*Fenney v. Dakota, Minnesota & Eastern R. Co.,* 327 F.3d 707, 711 -712(8th Cir. 2003).  *See also, Stuart v. Gen. Motors Corp.,* 217 F.3d 621, 630  (8th Cir. 2000) (stating an allegation of discipline is not like or related to an allegation of termination); *Sieberns v. Wal-Mart Stores, Inc.,* 125 F.3d 1019 (7th Cir. 1997)(finding a complaint of failure to accommodate and termination are separate things not like or reasonably related); *Jones v. Sumser Ret. Vill,* 209 F.3d 851, 853-854 (6th Cir. 2000)(holding a termination claim is far different from a failure to accommodate claim); *Weigel v. Target Stores,* 122 F.3d 461, 464 (7th Cir. 1997)(Stating that one cannot expect a failure to accommodate claim to develop from an investigation into a claim that an employee was terminated because of a disability).

In *Rankin v. Greater Media, Inc.,* 28 F.Supp.2d 331 (D. Md. 1997), the court determined that Rankin had failed to exhaust her administrative remedies

as to her claim for failure to accommodate her disability.  In her charge, Rankin had alleged that Greater Media, Inc., demoted her and constructively discharged her in retaliation on the basis of her disability.

> Plaintiff did not allege that Defendants failed to accommodate her disability, a separate and distinct theory of liability, and indeed explicitly stated that she did not need any additional accommodations.  In these circumstances, Plaintiff's current allegation of failure to accommodate cannot be said to be "reasonably expected to follow" from the charges filed with the EEOC.

*Rankin,* 28 F. Supp.2d at 340.  *See also, Bugg-Barber v. Randstad US, L.P.,* 271 F.Supp.2d 120 (D.D.C. 2003)(Plaintiff failed to either ask for an accommodation or identify failure to accommodate in her charge of disability discrimination for termination of her employment.  The date of the alleged discrimination was the date of her discharge).

Hohn's claims of disparate treatment and failure to accommodate should be barred from consideration in this case because he failed to exhaust his administrative remedies.  Additionally, Hohn's allegation of failure to provide a lighting accommodation in September of 2003 is not related nor does it arise from the allegations in his Charge that he was placed on medical leave on April 29, 2004, in retaliation for making a safety hotline complaint.  (Filing No. 29, ¶¶ 15 and 16, Plaintiff's Answers to Interrogatory No. 9).

## IV.

### HOHN IS NOT A QUALIFIED INDIVIDUAL WITH A DISABILITY WHO IS ABLE TO PERFORM THE ESSENTIAL FUNCTION OF THE POSITION OF MACHINIST WITH OR WITHOUT AN ACCOMMODATION.

If the Court should find that Hohn did exhaust his administrative remedies as to his claims of disparate treatment based upon his disability, then it is the BNSF's position that Hohn is not a qualified individual with a disability who is able to perform the essential functions of the machinist position with or without an accommodation.  The provisions of the ADA relating to employment only protect a "qualified individual."

The Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, prohibits employers form discriminating "against a qualified individual because of a disability of such individual."  42 U.S.C. § 12112(a).  "A plaintiff seeking relief under the ADA must establish that he is a disabled person within the meaning of the ADA, that he is qualified to perform the essential functions of his job either with or without reasonable accommodation, and that he was terminated because of his disability."  *Wooten v. Farmland Foods,* 58 F.3d 382 (8th Cir. 1995).

The ADA defines a disability as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual."  42 U.S.C. § 12102(2)(A).  Despite Hohn's denial he is without a doubt a person with a disability.  Hohn suffers from either Retinitis Pigmentosa or Choroiderimia and has alleged in his Amended Complaint that he is legally blind.  (Filing No. 29,¶ 9).  As a result of Hohn's visual field being limited to 15 degrees in both eyes as of August 2004, Hohn is legally blind pursuant to the Nebraska Department of Motor Vehicles Rules and Regulations.  247 NAC § 7-002.01B.  (Ex. 5).  Hohn's own eye doctor, Dr. Dietrich, also agrees that Hohn's vision is substantially limited as a result of Hohn suffering either from Retinitis Pigmentosa or

Chorioderimia.  (Deposition of Dietrich, 10:7-11:3; 15:6-18:3, Filing No. 29, ¶ 10).
Note there seems to be little difference between the Retinitis Pigmentosa and
Chorioderimia other than the onset of the disease.

Hohn is not able to perform the essential functions of the position of a
machinist with or without an accommodation as a result of his visual impairment.
In order to be a qualified individual, Hohn must be able to perform the essential
functions of a machinist position.  42 U.S.C. § 12111(8), *Cravens v. Blue Cross &
Blue Shield of Kansas City,* 214 F.3d 1011, 1016 (8th Cir. 2000).   The
determination of qualification involves a two-fold inquiry: (1) whether Hohn meets
the necessary prerequisites for the job, such as by education, training, and
experience, and (2) whether Hohn can perform the essential job functions with or
without a reasonable accommodation.   *Treanor v. MCI Telecommunications
Corp.,* 200 F.3d 570, 575-76 (8th Cir. 2000) and *Canny v. Dr. Pepper Seven-Up
Bottling Group,* 439 F.3d. 894, 900 (8th Cir. 2006).  The BNSF does not dispute
that Hohn meets the prerequisites of the job of machinist by education, training,
and experience.  However, Hohn is not able to perform the essential functions of
the position.

An employer's identification of a position's essential functions is given
some deference under the ADA.  *Nesser v. Trans World Airlines, Inc.,* 160 F.3d
442, 445-46 (8th Cir. 1998) and *Heaser v. The Toro Co.,* 247 F.3d 826, 831 (8th
Cir. 2001).  It has also been determined that the "initial inquiry in determining
whether a job requisite is essential is whether an employer actually requires all
employees in the particular position to perform the allegedly essential function."

*Milton v. Scrivner, Inc.,* 53 F.3d 111 (10th Cir. 1995) (citing 29 CFR Pt. 1630, App. § 1630.2(n)).   Calvin Hobbs, the BNSF Shop Superintendent at the Alliance facility at the time Hohn was taken out of duty has stated that the following are the essential functions of a machinist position:

> a.  Performing locomotive servicing, maintenance, troubleshooting, and other machinists' duties as directed by a supervisor or per union agreement;
>
> b.  Inspecting locomotive components (including internal engine inspection of pistons, cylinders, liners and crank case) periodically as required by federal regulation and at other intervals per company policy;
>
> c.  Inspecting fuel and all other fluid levels in locomotive, as necessary;
>
> d.  Inspecting wheels to ensure that flange, rims, treads, plate, hub, axle and bearing are in good repair;
>
> e.  Inspecting brake apparatus including brake shoes, beams, hangers, rods, and associated equipment, inspects locomotives for any visible or audible leaks in water, fuel, or oil lines;
>
> f.  Using test equipment to install, calibrate, and verify the operational specifications of equipment or systems;
>
> g.  Operating proper electric, pneumatic, or hydraulic hand tools such as drills, impact wrenches, power saws and grinders;
>
> h.  Accurately distinguishing and interpreting signals, signs,

machine/equipment displays, and accurately distinguishing colors as well as possessing spatial perception to work safely within, around, over and under locomotives;

i. Safe and frequent using of machinery/equipment (such as power tools, hand tools, forklifts, overhead and wheel based cranes, etc.); and

j. Frequent bending, stooping, kneeling, and climbing ladders, and frequent walking on uneven/angled surfaces.

(Declaration of Hobbs, ¶ 7). Hohn has identified these functions in his own deposition when he addressed his training during the time he worked as an apprentice. (Deposition of Hohn, Ex. 4A, 37:22-67:18). The shop foreman will assign the machinists to the appropriate location. (Deposition of Hohn, Ex. 4A, 67:19). A machinist may not have to perform every single function identified above during every day of his or her employment. However, a machinist needs to be able to perform any one of these functions as they are assigned per the Union Agreement. (Declaration of Hodgson, ¶ 3, Ex. 6A and 6B).

Prior to April 29, 2004, the BNSF had concerns about Hohn's ability to work safely because it appeared that Hohn may have a vision problem, but did not know if Hohn had a visual impairment. (Declaration of Hobbs, ¶ 5). This concern was based on observations that were made of Hohn by other employees and Hohn's supervisors, Ceceilia Deichert, Jennifer Crawford, and Douglas Miller. (Exs. 1A, 1B, and 1C). These were legitimate concerns that the BNSF had and had every right to determine if Hohn's vision presented a problem not

29

only for Hohn's safety, but the safety of others. 42 U.S.C. § 12112(4) and 29 C.F.R. § 1630.14(b)(3)(C). The BNSF was forced to take a careful, proactive approach in Hohn's case.  On April 26, 2004, Hobbs made the decision to pull Hohn from duty and place Hohn on paid medical leave until it could be established by an eye doctor that it was safe for Hohn to work.  Hohn was given five days of paid medical leave to get an eye examination initially on April 29, 2004.  (Ex. 1D).  This five day paid medical leave was subsequently extended to June 9, 2004; when Hohn reported he could not get an eye appointment right away.  (Ex. 1F).  A determination of whether Hohn was a "qualified individual" could not be made until Hohn's eyes were examined.

The BNSF's concerns for Hohn's vision and Hohn's ability to work safely with his vision were more than validated by Dr. Dietrich's evaluation on May 10 and 13, 2004.  Dr. Dietrich described Hohn's visual field as being so restricted that it was similar to looking through two drinking straws.

Dr. Dietrich was asked to determine whether Hohn was fit to return to work.  Dr. Dietrich filled out a Fitness for Duty Form that limited Hohn to working a desk job and included the following restrictions:

> No walking on uneven surfaces; occasional stooping, bending and twisting; no operating vehicles or machinery; no climbing ladder or scaffold; no working on unprotected heights; occasional lifting over 20 pounds; and no task that requires a visual field exceeding 15 degrees.

(Deposition of Dr. Dietrich, 27:3-28:25, 30:11-13, Ex. 3A).   Dr. Dietrich recommended that Hohn work only at a desk job.  The BNSF's medical officer, Dr. Sharon Clark, reviewed these restrictions and Dr. Dietrich's records and agreed with Dr. Dietrich's restrictions.  (Declaration of Clark, ¶ 4, Ex. 3B).  There

can be no doubt that these restrictions were recommended for the protection of Hohn and the individuals that he worked with at the Alliance Diesel Shop.  These restrictions have not been changed by any eye doctor Hohn has seen.  (Ex. 3C).

Calvin Hobbs reviewed these restrictions and with his knowledge of the essential functions of the position of machinist, and the environment of the job because of the restriction regarding Hohn's peripheral vision, determined that Hohn's restrictions could not be accommodated for the machinist position and Hohn would not be allowed to return to work with such restrictions.  (Declaration of Hobbs, ¶ 9).  The restrictions recommended by Dr. Dietrich virtually limited Hohn to working at a desk job.  Working at a desk is not an essential function of the machinist position.  (Ex. 1, ¶ 7).

Because of the nature of Hohn's impairment, it is necessary to evaluate the work environment in determining whether Hohn can perform these essential functions  The fact that Hohn is not able to safely perform the essential functions of his position at the Alliance facility was vividly made clear when Dr. Dietrich reviewed the photographs of the Alliance facility and unequivocally asserted that Hohn could not work there with a visual field that was equated to looking through two drinking straws.  (Deposition of Dietrich, 16:10-15; 37:1-16, Ex. 27, 65-75, and 78-88, Deposition of Hohn, Ex. 4B, 7:17-25; 27:17-34:12; 35:5-39:18).  Not only would it be dangerous to Hohn, but it would also endanger the other employees at the Alliance facility.  The BNSF should not be in the position of placing Hohn or any other BNSF employee in a dangerous situation that is ripe for serious injury, including death.

The EEOC has defined "direct threat" in the context of the ADA as follows:

Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation.  The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual' represent ability to safely perform the essential functions of the job.  This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence.  In determining whether an individual would pose a direct threat, the factors to be considered include:

1.      The duration of the risk;

2.      The nature and severity of the potential harm;

3.      The likelihood that the potential harm will occur; and

4.      The imminence of the potential harm.

29 CFR § 1630.2 (r).  The BNSF has established that it would be a direct threat to the safety of Hohn and other employees to allow Hohn to work as a machinist by relying on the up-to-date medical reports and recommendations from Hohn's own eye doctors.  The nature and severity of the harm could be catastrophic for Hohn and other employees.  Hohn's prognosis for his vision will not improve, it will only get worse.

Hohn cannot prove the prima facie case because he is not a "qualified individual" as defined by the ADA who is capable of performing the essential functions of a machinist position.

## IV.

**A REASONABLE ACCOMMODATION DOES NOT EXIST THAT WILL ALLOW HOHN TO WORK AS A MACHINIST AT THE BNSF ALLIANCE FACILITY.**

If the Court should find that Hohn's claim of failure to accommodate was appropriately exhausted administratively, then the BNSF disputes that a reasonable accommodation existed which would allow Hohn to continue to work as a machinist.  The BNSF strongly disagrees that Hohn is a qualified individual with a disability who is able to perform the essential functions of a machinist and that there are reasonable accommodations which are available which would allow Hohn to do so.

Hohn has made two separate allegations of failure to accommodate in his First Amended Complaint.  The first is that the BNSF failed to provide a lighting accommodation before the time that Hohn was taken off duty.  (Filing No. 29, ¶¶ 15 and 16).  The second allegation is that the BNSF failed to engage in the interactive process after Hohn's disability and restrictions were known.  (Filing No. 29, ¶¶ 28, 29, and 30).

### A.   Lighting Accommodation Request

As argued above, it is BNSF's position that Hohn did not exhaust his administrative remedies as to the request for a lighting accommodation because it did not arise, is not like, nor reasonably related to his allegation in his Charge that he was placed on medical leave in retaliation for his making a safety hotline complaint on April 29, 2004.

Hohn has indicated in his deposition that he made a request for a lighting accommodation in the fall of 2003.  He did not tie this particular request for a lighting accommodation to any impairment or disability.  (Deposition of Hohn, Ex. 4A, 108:1-114:10).  In order for Hohn to succeed on a failure to accommodate

claim under the ADA, Hohn must at the minimum make it known to the BNSF at the time he makes the request for an accommodation that he has a disability with a limitation that needs to be accommodated. *Miller v. National Casualty Co.,* 61 F.3d 627, 629 (8th Cir. 1995); *Cannice v. Norwest Bank Iowa N.A.,* 19 F.3d 723, 726 (8th Cir. 1999); and *Ballard v. Rubin,* 284 F.3d. 957, 962 (8th Cir. 2002). Hohn has admitted that when he made the request in the fall of 2003 he did not mention that he had a disability, only that he was annoyed with the lighting. The BNSF is entitled to summary judgment on Hohn's request for a lighting accommodation. As previously mentioned above, this claim was not administratively exhausted.

### B. Interactive Process

Hohn's second issue on reasonable accommodation concerns the allegation that the BNSF failed to engage in the interactive process to determine if a reasonable accommodation was available for Hohn to perform the essential functions after the nature of Hohn's medical condition was determined by Dr. Dietrich. (Filing No. 29, ¶¶ 26, 27, 28, 29, 30, and 37).

The steps the BNSF took to determine whether Hohn had a visual impairment and to determine if the restrictions imposed because of the impairment could be accommodated were reasonable. The BNSF placed Hohn on paid medical leave to give him time to determine if there was a problem with his vision. The BNSF generously extended this time to June 9, 2004, without the knowledge that Hohn had a chance to have his eyes examined on May 13, 2004.

To establish that the BNSF failed to engage in an interactive process, Hohn must show (1) he was disabled, (2) he requested accommodations, (3) The BNSF did not assist him in seeking accommodations, and (4) he could have been reasonably accommodated, but for the BNSF's lack of good faith. *See Cravens v. Blue Cross & Blue Shield of Kansas City,* 214 F.3d 1011, 1021 (8th Cir.2000) (quoting *Fjellestad v. Pizza Hut of Am., Inc.,* 188 F.3d 944, 952 (8th Cir.1999)); and *Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc.* 439 F.3d 894, 902 (8th Cir. 2006).  The burden is on Hohn "to show that a reasonable accommodation, allowing him to perform the essential functions of his job, is possible."  *Mole v. Buckhorn Rubber Prods., Inc.,* 165 F.3d 1212, 1218 (8th Cir. 1999).

Hohn arguably has made three requests for accommodations.  The first request would be his request that he be allowed to work as a machinist in D Building in the Alliance Mechanical facility.  (Deposition of Hohn, Ex. 4A, 45:8-17).  The second and third requests he made to Dr. Clark in May 2005 were that he either be allowed to work without any restriction or he be allowed to do a field test to show what he could do.  (Ex. 3, ¶ 5).  None of these requests are reasonable and all of the requests violate the restrictions imposed by Dr. Dietrich and adopted by the BNSF.

## A.    D BUILDING

It is Hohn's opinion that the restrictions imposed by the BNSF would allow him to work in D Building because there are no uneven surfaces.  Hohn's interpretation of what qualifies as an uneven surface differs substantially from Dr.

Dietrich's position and Calvin Hobbs.  (Ex. 1, ¶ 11).  When shown photographs of D Building, Dr. Dietrich strongly voiced his opposition to Hohn being allowed to work in that building.

> Again, ramps, grated stepways, diamond metal casing stepways, pits. This would look like a highly dangerous area.  And here's even a picture of some fluid . . . No definitely, this would be, in my opinion an area of great danger for him to be in and work safely with himself or among others.

(Deposition of Dietrich, 37:14-23, Deposition of Hohn, Ex. 4B, 33:12-39:12, Exs. 75-88).   It is not a reasonable accommodation to allow Hohn to work in D Building.   Additionally, Hohn would still be required to be able to work in other areas besides D Building because of the Union Agreement for his craft.  (Declaration of Hodgson, ¶ 3, Ex. 6A and 6B).

It is not only the restriction from working on uneven surfaces that must be considered in evaluating whether Hohn could work in D Building, there is also the restriction of working anywhere requiring greater than 15 degree peripheral field that also prohibits Hohn from working in D Building.

Hohn has suggested that he can maneuver "D" Building as long as they have not changed it.  "I'm familiar with the area, unless they have screwed things up too much.  I know where everything's at and they can just point me at a locomotive and go – and I go to work on it." (Deposition of Hohn, Ex. 4B, 92:16-25).  What Hohn fails to take into account is that there is nothing static about the BNSF Alliance Diesel Shop.  While there may be permanent fixtures, it is the nature of the facility to have locomotives moving in and out.  There are other employees working in different area with their tools and equipment out in the area.  There are forklifts and smaller utility vehicles being moved in the area.

Despite Hohn's knowledge of where the permanent fixtures may be, he will still have difficulty with the objects that are not always in the same place such as other employees, locomotives, utility vehicles, parts of the locomotive and tools. There is also the risk that he could step into a pit.

Assigning Hohn to D Building is not a reasonable accommodation because it would violate the restrictions imposed by Dr. Dietrich and adopted by the BNSF.

### B.   Field Test or Be Allowed to Work without Restrictions

In a May 2005 letter to Sharon Clark, D.O., M. P. H., Hohn has requested that he be allowed to do a field test to demonstrate what he is capable of performing or that he be allowed to work without the restrictions recommended by Hohn's eye doctor and adopted by the BNSF.  Clark has declined to pursue either of these options because they would violate the restrictions that have been imposed for the safety of Hohn and others.  (Declaration of Clark, ¶ 5).

Hohn's propensity to violate the restrictions imposed on him makes him a danger to himself and other employees if he were allowed to go back to work at the BNSF.  Hohn's propensity to violate his restrictions has been shown by his disagreement with the restrictions recommended by Dr. Dietrich.   He has repeatedly said that he violates these restrictions every day.  He drives a vehicle, he operates machinery such as a lawn mower, he climbs on a ladder, and on his roof to clean his gutters.  (Deposition of Hohn, Ex. 4A, 197:24-198:21 and Ex. 4B, 49:20-50:20; 92:2-11, 93:3-24, 107:9).   The fact that Hohn has made a decision to violate Dr. Dietrich's restrictions in Hohn's daily life does not make it

reasonable to allow Hohn to violate the same restrictions at the BNSF's Alliance facility when he is not only putting himself at risk but other employees as well.

"There is no precise test for what constitutes a reasonable accommodation, but an accommodation is unreasonable if it 'either imposed undue financial or administrative burdens, or requires a fundamental alteration in the nature of the program.'" *DeBord v. Board of Educ.,* 126 F.3d 1102, 1106 (8th Cir. 1997).  The BNSF cannot control what Hohn does in his life outside of his job with the BNSF.  The BNSF can control what occurs in its own work place.  The BNSF's decision not to allow Hohn to violate Dr. Dietrich's restrictions and place himself and other BNSF employees in harm's way is a reasonable and sound decision.  The BNSF does not have to reallocate or eliminate the essential functions of a job to accommodate Hohn.  *Dropinsky v. Douglas County,* 298 F.3d  704, 709-10 (8th Cir. 2002).  Even if it were possible to change the working environment at the BNSF Alliance facility, it would still be unreasonable to do so.  The BNSF cannot magically transfer the machinist position into a desk position or alter the structure of the Alliance Mechanical facility to make it safe for Hohn to work.

### C.    Job Reassignment

Job reassignment has also presented a problem in this case for Hohn. The BNSF machinists belong to a union, the International Association of Machinists and Aerospace Workers, Local Lodge 602.  (Deposition of Hohn, Ex. 4B, 98:10-13).  According to the Bylaws of the Union the machinists must be able to perform any other work that may be assigned to machinists.  (Declaration of

Hodgson, ¶¶ 3 and 6).  The jobs available to machinists are controlled by a seniority system.  (Deposition of Hohn, Ex. 4A, 88:15-25, Declaration of Hodgson, ¶ 3).  Even if there were a machinist position available that Hohn was able to perform, the reassignment would only be feasible if Hohn had the seniority to hold the position.  *Cravens v. Blue Cross and Blue Shield of Kansas City,* 214 F.3d 1011, 1019 (8th Cir. 2000).  The BNSF is further restricted by the Union's requirement that all machinists be able to do any function assigned to machinists.

The BNSF is not required to create a new position for Hohn as an accommodation.  *Cravens v. Blue Cross and Blue Shield,* 214 F.3d 1011, 1019 (8th Cir. 2000).  The employee must be qualified for the reassignment position. *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1114 (8th Cir. 1995).  The BNSF is not required to transfer Hohn to a different position if the reassignment would violate the contractual rights of other workers under a collective bargaining agreement.  *Benson,* 62 F.3d at 1114.

Hohn has alleged that he is able to perform the machinist position referred to as TSS operator and that he applied for this position in September 2006.  TSS stands for Transportation Support Services, a computer system.  A TSS operator works on a computer and enters data related to the arrival and departure of locomotives;  known defects of locomotives;  the work performed on the locomotive as it progresses through the facility; and ordering material and parts. (Declaration of Hodgson, ¶ 4).  The position that Hohn applied for in September 2006 was not solely a TSS position, it also involved working in C Building one

day a week in a relief position.  (Declaration of Hodgson, ¶ 7 and Ex. 6A and 6B, Deposition of Hohn, Ex. 4B, Ex. 25).  In addition to working in C Building one day a week, the position requires that the machinist be able to handle any other work that may be assigned to the machinist craft.  (Ex. 6).  As a result, Hohn was not qualified for the machinist relief position that he applied for in September 2006. (Declaration of Hodgson, ¶ 8).

Additionally, the BNSF has no guarantee that Hohn would work within his restrictions if there were a possibility of assigning him solely to a desk job.  When discussing the TSS position that was open Hohn indicated that the ideal job for him would involve splitting his work week between TSS and working in the shop. (Deposition of Hohn, Ex. 4B, 71:14-72:7).  Hohn does not believe that he is capable of working behind a computer five days a week.

Dr. Dietrich has indicated that given the progression of Hohn's disease he questions Hohn's ability to work on a computer if it would involve orders of some magnitude.  (Deposition of Diretrich, 31:7-15).  The function of the TSS position involves orders of some magnitude.  It is imperative that the BNSF has records of the work performed on the locomotives not only for the BNSF's liability, but also because such documentation is required by the Federal Railroad Administration. 49 U.S.C. § 20702(3) and 49 C.F.R. §§ 230.13 through 230.20.  Allowing Hohn to work solely on the computer in TSS is not a reasonable accommodation given the magnitude and significance of the TSS position.  It is necessary to keep accurate records of the inspections and repairs made to locomotives.

In conclusion, Hohn cannot prove that there was a possible reasonable accommodation available.  Each of Hohn's proposed accommodation is not reasonable.  The BNSF's concern for safety of Hohn and other employees is a strong factor weighing in favor of the BNSF's position that a reasonable accommodation does not exist.  The BNSF should not be in a position of inviting an accident to occur when the risks of harm are so well-known.

## CONCLUSION

The BNSF respectfully requests a summary judgment in its favor.  Any claim for retaliation or disability discrimination filed under the NFEPA is barred by the statute of limitations.  Neb. Rev. Stat. § 48-1120.01 (2004).  Hohn has failed to exhaust his administrative remedies as to his claims for disparate treatment and failure to provide a reasonable accommodation.  Hohn is not a qualified individual within the meaning of the ADA.  There is no reasonable accommodation which exists or that Hohn has proposed that would allow Hohn to perform the essential functions of the machinist position.

DATED this 12th day of March, 2007.


BNSF RAILWAY COMPANY, A
Delaware Corporation, Defendant.

By:     s/ Melanie J. Whittamore-Mantzios
        Thomas C. Sattler, #16363
        Melanie J. Whittamore-Mantzios, #18883
        WOLFE, SNOWDEN, HURD,
         LUERS & AHL, LLP
        Suite 800, Wells Fargo Center
        1248 "O" Street
        Lincoln, NE  68508
        (402) 474-1507

## CERTIFICATE OF SERVICE

I hereby certify that on March 12th, 2007, I electronically filed the foregoing **Brief in Support of Defendant's Motion for Summary Judgment** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Scott LaBarre
1660 South Albion Street
Suite 918
Denver, CO 80222

s/ Melanie J. Whittamore-Mantzios
Melanie J. Whittamore-Mantzios, #18883